# UNITED STATES DISTRICT COURT
## for the
### Eastern District of Pennsylvania

| | |
|---|---|
| United States of America<br>v.<br>FREDDY NAZARET GOMEZ CASTILLO<br><br><br><br>*Defendant(s)* | )<br>)<br>) Case No. 17-1608-M-1<br>)<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ in the county of ___Montgomery___ in the ___Eastern___ District of ___Pennsylvania___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 371 | conspiracy to commit wire fraud |

This criminal complaint is based on these facts:
SEE ATTACHED AFFIDAVIT

☐ Continued on the attached sheet.

*Complainant's signature*

Special Agent William Capra, DHS-HSI-ICE
*Printed name and title*

Sworn to before me and signed in my presence.

Date: December 1, 2017

*Judge's signature*

City and state: Philadelphia, PA    Honorable David R. Strawbridge, US Magistrate Judge
*Printed name and title*

# UNITED STATES DISTRICT COURT
for the

Eastern District of Pennsylvania

| | |
|---|---|
| United States of America<br>v.<br>JOSE FRANCISCO GOMEZ VILLASMIL<br><br>*Defendant(s)* | )<br>)<br>) Case No. 17-1608-M-2<br>)<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ in the county of __Montgomery__ in the __Eastern__ District of __Pennsylvania__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 371 | conspiracy to commit wire fraud |

This criminal complaint is based on these facts:
SEE ATTACHED AFFIDAVIT

☐ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent William Capra, DHS-HSI-ICE
*Printed name and title*

Sworn to before me and signed in my presence.

Date: December 1, 2017

_____
*Judge's signature*

City and state: Philadelphia, PA

Honorable David R. Strawbridge, US Magistrate Judge
*Printed name and title*

Affidavit in support of a criminal complaint

William Capra, being duly sworn, states as follows:

1.  I am a Special Agent with Homeland Security Investigations ("HSI"), and have been so employed since November 2006. Prior to my employment as a Special Agent, I was an Officer with Customs and Border Protection ("CBP"), from October 2004 to November 2006. Since becoming a Special Agent, I have participated in numerous investigations into suspected international narcotics trafficking and money laundering. I am currently assigned to the Philadelphia Special Agent in Charge HSI Office, Cybercrimes Group. Prior to my current duty location, I was assigned to the Pittsburgh Assistant Special Agent in Charge HSI Office, Contraband Smuggling Group.

2.  I am an investigator or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered to conduct investigations of, and to make arrests for, the offenses enumerated in Titles 8, 18, 19, 21, and 31 of the United States Code and other related offenses.

3.  In addition to my investigative experience, I have successfully completed the following trainings: Customs and Border Protection Integrated Basic Academy, Criminal Investigator Training Program, ICE Special Agent Training, Conducting Title III Intercepts, Asset Identification and Removal Group/Financial Investigations, Designated Technical Agent, HIDTA Dark Web, Department of Justice's Complex Computer, Virtual Currency and HSI Online Undercover Investigations trainings. I am adjunct instructor at the Federal Law Enforcement Academy and I have graduated from ICE'S Instructor Development Course. Lastly, I have earned a Bachelor's degree in Law Justice Studies, with a minor in Business Administration, from Rowan University in Glassboro, New Jersey in December 2001.

4.  The information contained in this affidavit is based on my personal observations, my training and information provided by other law enforcement officers and/or agents. This affidavit sets forth only those material facts that I believe are necessary to establish probable cause. It does not include each and every fact of this investigation.

5.  On the evening of November 29, 2017, a Homeland Security Investigations (HSI) special agent from our Nashville, Tennessee office contacted me and explained that Freddy Nazaret GOMEZ-CASTILLO had arrived in the Philadelphia area. The Nashville special agent further explained that GOMEZ-CASTILLO was a Venezuelan citizen who was a member of an Automated teller machines ("ATM") skimming organization based in Miami, Florida.

6.  I know based upon my training and experience, ATMs are electronic devices operated by financial institutions for use by banking customers to conduct banking transactions, such as withdrawing money from accounts. ATMs are located on the premises of financial institutions and other business establishments.

7.  A standard ATM requires the user to identify herself or himself as a particular banking customer by inserting into a provided card reader a unique credit or debit card with a magnetic stripe that stores data about the user's bank account. The ATM then requires the cardholder to verify her or his identity by typing a unique personal identification number ("PIN") onto a provided keypad. Once the correct PIN is entered by the user, the ATM provides the user access to the user's bank account, which can include permitting the user to withdraw a specific

amount of available funds from the account in the form of United States currency. In this way, credit and debit cards and PINs used at ATMs function as "access devices," as that term is defined in 18 U.S.C. § 1029(e)(1).

8. ATMs are typically connected to interbank networks, which communicate over interstate wires and enable a banking customer to withdraw money from an account using an ATM owned and operated by a financial institution other than the financial institution that holds the account.

9. Access device skimming schemes, also known as ATM skimming schemes, are fraud schemes by which participants in the schemes use devices to capture account information and PINs while individual victims use credit and debit cards, create counterfeit debit or credit cards, and use the counterfeit cards and stolen PINs to obtain cash and other property.

10. A skimming device is a device that surreptitiously records account information from credit or debit cards while such cards are in use. Participants in the scheme typically install the device on, over, or inside a genuine card reader in such a way as to avoid detection by the card users. In some instances, the device is used in conjunction with a camera either contained within the device or in a separate device. The camera is focused on the keypad of the machine and is capable of capturing images of the user's manual entry of her or his PIN. In other instances, the electronic components of the skimming device can record the PIN and a camera is not necessary.

11. Participants in the access device skimming scheme typically remove the skimming device from the compromised machine after a period of time. Participants in the scheme then transfer the stolen account information recorded from credit or debit cards from the skimming device to a computer or other electronic storage device. The participants then match that information with corresponding PINs. More recently, participants have begun to use "Bluetooth" technology to transfer the stolen information via radio waves from the skimming device to a computer rather than using cables or wires to connect the skimming device and the computer. This technology allows the criminals to surreptitiously download the stolen account information without the need to remove the skimming device from the compromised machine.

12. A counterfeit credit or debit card can be made by transferring a genuine card's account information to another card with a magnetic stripe through use of a magnetic stripe encoding machine. Participants in the scheme may then use the counterfeit card with the corresponding PIN to fraudulently withdraw funds from a compromised bank account or at a business to fraudulently purchase goods and services.

13. Based on my training and experience, I know that access device skimming generally requires a considerable amount of equipment and tools to affix the skimming devices to the compromised machine and surreptitiously download and use the stolen account numbers. The equipment needed includes the devices and their component parts, cameras used to record the manual entry of PINs, computers and other electronic devices used to store and transfer stolen account information and PINs, paper documents listing PINs and amounts of money, cards with magnetic stripes for use as counterfeit debit and credit cards, and magnetic stripe encoding machines used to make counterfeit debit and credit cards. Based on my training and experience, criminals involved in access device fraud typically keep these tools, equipment, and other implements in their vehicles or homes for safekeeping. Criminals involved in access device fraud typically keep or carry tools, putty, glue, wires, and spare parts of access devices in

their vehicles in case the need arises to fix or maintain the skimming devices. Finally, based upon my training and experience, I know that criminals involved in access device fraud often keep the cash proceeds from their offense, fraudulent encoded access devices cards, and other assets purchased with the proceeds of the fraud in their homes or vehicles.

14. GOMEZ-CASTILLO and other known and unknown members of the ATM skimming organization were under federal investigation for stealing approximately $100,000 from a bank in the Nashville area using ATM skimmers. Bank video surveillance from September 29, 2017, at a US Bank in Tennessee showed GOMEZ-CASTILLO shuffling through numerous cards and inserting them into the ATM. The bank's fraud division confirmed that the cards he was using were from the group of cards compromised; when a skimming device was placed on their ATM located at 1816 Madison Street Clarksville, TN in Montgomery County.

15. Based upon this information, I contacted other HSI special agents and Pennsylvania State Police (PSP) troopers to conduct surveillance the following morning to locate and follow GOMEZ-CASTILLO and his associates.

16. On November 30, 2017, at approximately 0900, a Pennsylvania State Police ("PSP") trooper located a black colored Kia SUV in the parking lot of the Hyatt House Philadelphia/Plymouth Meeting located at 501 East Germantown Pike, East Norriton, Pennsylvania 19401.

17. At approximately 1430 hours on November 30, 2017, a PSP trooper observed four (4) individuals walking through the rear parking lot of Chili's Bar and Grill, towards the Lord and Taylor department store, located at 121 East City Line Avenue, Bala Cynwyd, Pennsylvania 19004. The PSP trooper identified one of the individuals as Freddy Nazaret GOMEZ-CASTILLO based on a photograph provided by HSI agents in Nashville. The PSP trooper observed Freddy Nazaret GOMEZ-CASTILLO and a male later identified from his passport and driver's license as Jose Francisco GOMEZ-VILLASMIL enter a black colored Toyota Corolla. The other two (2) individuals, a male and a female, entered the Kia SUV. Troopers and special agents began to follow the Corolla and SUV and determined that the vehicles appeared to be following each other to different store parking lots located on City Line Avenue in Philadelphia, Pennsylvania. The troopers and special agents suspected that drivers were unfamiliar with the area or were attempting to evade surveillance officers because the drivers of the rental vehicles conducted several illegal U-turns and lane changes in the Main Line area. Later surveillance conducted throughout the day by troopers and agents determined that the aforementioned vehicles were be used by GOMEZ-CASTILLO and GOMEZ-VILLASMIL.

18. At approximately 1440 hours, officers observed GOMEZ-CASTILLO and GOMEZ-VILLASMIL park the Corolla in the parking lot of the Target department store, located at 4000 Monument Road, Philadelphia, Pennsylvania 19131. GOMEZ-CASTILLO and GOMEZ-VILLASMIL then got out of the Corolla and walked into the Target department store. At the same time, investigators observed the Kia SUV enter the same Target department store parking lot and parking on the opposite side of the parking lot from the Corolla. Two individuals remained inside of the Kia SUV. A short time later, GOMEZ-CASTILLO and GOMEZ-VILLASMIL left the Target department store with a shopping bag and entered the Corolla. While GOMEZ-CASTILLO and GOMEZ-VILLASMIL sat in the Corolla, investigators saw a female get out of the Kia SUV and walk into the Target department store. At approximately 1511 hours, this female left the

Target department store carrying a shopping bag and entered the Kia SUV. Both vehicles then exited the Target department store parking lot and began to follow one another.

19. At approximately 1600 hours, I was able to join the surveillance with my fellow troopers and special agents at Hyatt House Philadelphia/King of Prussia located at 240 Mall Boulevard, King of Prussia, Pennsylvania 19406. I observed GOMEZ-CASTILLO driving the Corolla and GOMEZ-VILLASMIL was seating in the passenger side of the vehicle. GOMEZ-VILLASMIL exited the vehicle and entered the Hyatt House Philadelphia/King of Prussia with a small bag, approximately the size of a United States dollar bill, in his right hand. After a few minutes, GOMEZ-VILLASMIL left the hotel with a black and white backpack. I saw GOMEZ-VILLASMIL place the backpack in the trunk of the vehicle and the two men depart the area.

20. Officers followed the Corolla to the Exxon gas station located at 113 North Gulph Road where they two men stopped the vehicle along the gas pumps but did not purchase any gas. They continued on from the gas station to the Kingswood Apartment located at 170 Clubhouse Road in King of Prussia. Officers observed GOMEZ-CASTILLO park the vehicle at the front of the apartment complex and get out of the vehicle to smoke a cigarette. GOMEZ-CASTILLO did not meet anyone at the apartment complex, and based on my training and experience, I believe he stopped at the location to determine if he and GOMEZ-VILLASMIL were being followed by law enforcement. After he finished the cigarette, GOMEZ-CASTILLO reentered the vehicle and departed the area traveling back toward the King of Prussia Mall, and officers followed the pair.

21. At approximately 1623 hours, I initiated a traffic stop of the Corolla using my emergency lights in the vicinity of 552 South Goddard Boulevard in King of Prussia. GOMEZ-CASTILLO was driving the vehicle and GOMEZ-VILLASMIL was sitting in the front passenger seat.

22. GOMEZ-CASTILLO and GOMEZ-VILLASMIL were removed from the vehicle and separated for an immigration interview. I used a translator to speak with GOMEZ-CASTILLO and GOMEZ-VILLASMIL in Spanish. I asked GOMEZ-CASTILLO for consent to search his black back and the Corolla. GOMEZ-CASTILLO gave consent to me and PSP Trooper James Wisnieski. Inside the vehicle glove compartment, officers located a large number of prepaid gift cards that were still in their original packaging. From my training and experience, I know that gift cards like this can be used to reincode stolen credit card and ATM card information. 17 of these gift cards were from a TARGET store. I know that such cards can be obtained from the TARGET store at 4000 Monument Road in Philadelphia.

23. Inside of the trunk, officers located the black and white bag that GOMEZ-VILLASMIL left with at the Hyatt House Philadelphia/King of Prussia. I was unable to locate GOMEZ-CASTILLO's passport although he insisted it was in his black backpack. Ultimately, GOMEZ-CASTILLO told agents that his passport was hidden behind a plastic panel on the driver-side center console. Agents removed the panel and discovered GOMEZ-CASTILLO's passport.

24. Next I approached GOMEZ-VILLASMIL and asked him in Spanish using the translator if the backpack in the trunk belonged to him. GOMEZ-VILLASMIL answered in the affirmative. I then asked if he would consent to a search of the backpack, and he also answered in the affirmative. This conversation was witnessed by Trooper Jordan Sonka. Inside the bag, officers located GOMEZ-VILLASMIL's clothing and personal effects along with a laptop computer, skimming device, thumb drive, external hard drive, and an external card reader. As described above, I know from my training and experience that this equipment can be used to read

information from a credit card or ATM card and to encode stolen card information onto such a card.

25. Based upon the results of the consent search, uncertainty of their immigration statuses, and Nashville HSI's previous investigative findings, GOMEZ-CASTILLO and GOMEZ-VILLASMIL were transported to the PSP Belmont Barracks for further interviewing. Their vehicle was turned over to a towing company so it could be returned to Avis.

26. At the State Police Barracks, I interviewed GOMEZ-CASTILLO with the assistance of a Spanish speaking agent. After receiving his Miranda warnings, GOMEZ-CASTILLO agreed to speak. However, his answers were generally evasive and inconsistent. He told me that he had traveled from Miami to Philadelphia, but could not remember the name of the hotel where he stayed. He also changed his story about whether he had checked a bag. He also claimed that he had come to Philadelphia to sightsee, but could not identify any sights that he had seen.

27. I also interviewed GOMEZ-VILLASMIL along with a Spanish speaking agent. After receiving his Miranda warnings, GOMEZ-VILLASMIL agreed to speak with us. GOMEZ-VILLASMIL told the agents that he was a personal trainer and Lyft driver in Miami, Florida. GOMEZ-VILLASMIL said he travelled to the Philadelphia area to be "a driver" but he did not have the opportunity they "didn't get the chance to do anything." GOMEZ-VILLASMIL was asked to explain specifically and he said they did not "falsify" any cards. GOMEZ-VILLASMIL believed that it was illegal to "have those items" in his backpack but insisted that "no act was completed." GOMEZ-VILLASMIL claimed that he was in the Philadelphia area for approximately three to four days by himself.

28. GOMEZ-VILLASMIL admitted he went to the Hyatt House Philadelphia/King of Prussia earlier in the afternoon. However, he did not rent a room there because "those guys take care of it." A person he knew as DENNIS gave GOMEZ-VILLASMIL key but then instructed GOMEZ-VILLASMIL to leave because they thought they were "being followed." GOMEZ-VILLASMIL suspected that law enforcement was following them approximately two to three hours before the traffic stop.

29. GOMEZ-VILLASMIL admitted ownership of the black and white bag. He claimed that "they" gave him "those things" contained in the backpack which he placed in the trunk of the Corolla. GOMEZ-VILLASMIL admitted that he purchased the screwdrivers that were found in the Corolla. The screwdrivers were needed to take apart the car to hide "documents and passports."

30. GOMEZ-VILLASMIL thought the electronic devices in his backpack belonged to DENNIS, however he knew that they were in the bag. GOMEZ-VILLASMIL said he "imagined" that the computer contained programs "for the cards." GOMEZ-VILLASMIL admitted that they use "the cards" to "get money" through theft and fraud.

31. GOMEZ-VILLASMIL was recruited by DENNIS with the promise of making "good money." He said he expected to make approximately $1000 but it depending how many days he was in the area. He did not anticipate that they would be in the Philadelphia area for "too long."

32. Based on the above, there is probable cause to believe that Freddy Nazaret GOMEZ-CASTILLO and Jose Francisco GOMEZ-VILLASMIL and others conspired to commit wire fraud in violation of 18 U.S.C. § 371.

WILLIAM CAPRA
Special Agent
United States Department of Homeland Security

Sworn to and Subscribed to before Me
on this / day of December, 2017

Honorable David R. Strawbridge
United States Magistrate Judge